UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

RICHARD SHARP,                      )
                                    )
          Plaintiff,                )
                                    )
     v.                             )    No. 2:09 CV 48 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
          Defendant.                )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Richard Sharp for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u> The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc.8.) For the reasons set forth below, the ALJ's decision is reversed and remanded.

**I. BACKGROUND**

Plaintiff Richard Sharp was born on February 24, 1960. (Tr. 22.) He is around 6'3" tall with a weight of approximately 300 pounds. (Tr. 32, 379.) He is married to Mary Sharp. (Tr. 31.) He completed twelve years of schooling and a special job training program as an auto mechanic. (Tr. 22, 167.) From 1977 to 2004, Sharp averaged around $3,500 annual income, including two years with no income. (Tr. 111.) He last worked July 29, 2004. (Tr. 22.)

On March 20, 2006, Sharp applied for disability insurance benefits, alleging he became disabled July 29, 2004, after falling off a ladder and breaking his ankle. (Tr. 34, 98, 161.) He also alleged knee problems, carpal tunnel syndrome, anxiety, a "plate in [his] skull," and ringing ears as limiting his ability to work. (Tr. 161.) He received a notice

of disapproved claims on May 25, 2006. (Tr. 61-62, 65-66.) After a hearing on October 11, 2007, the administrative law judge (ALJ) entered a decision partially favorable to Sharp on March 26, 2008. (Tr. 27, 10.) The ALJ found that defendant was disabled as defined by law and entitled to disability insurance benefits beginning July 29, 2004, and ending August 24, 2007. (Tr. 22-23.) However, the ALJ found that Sharp was not disabled as defined by law after August 23, 2007. (Id.) On August 7, 2009, the Appeals Council denied Sharp's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1.)

## II. MEDICAL HISTORY

On July 29, 2004, Sharp fell from an extension ladder at work and injured his left ankle. (Tr. 33-35, 440.) He was taken to the University of Missouri Hospital, where a computed tomography (CT) examination of his ankle revealed a broken talar body and talar neck fracture with subtalar dislocation.[1] (Tr. 434-35.) Sharp underwent open reduction and internal fixation of his subtalar joint in the emergency room. (Tr. 401-03.) On July 31, 2004, he was discharged to outpatient care. (Tr. 404-05.)

On September 15, 2004, Paul Shurnas, M.D., of the Columbia Orthopaedic Group, noted increasing pain in Sharp's left ankle, and recommended Sharp use a controlled ankle motion (CAM) boot and do non-weight-bearing exercises. (Tr. 290.) Five days later, Dr. Shurnas admitted Sharp for a successful incision and debridement in response to a possible infection in his ankle.[2] (Tr. 286-89, 359.)

On November 9, 2004, Dr. Shurnas noted Sharp's progress, but also noted lingering stiffness and soreness. (Tr. 283.) By the end of the month, Sharp was experiencing numbness, tingling, and pain in his ankle, leading Dr. Shurnas to diagnose post-traumatic arthritis, ankle

---

[1] The talus is the bone in the foot that articulates with the tibia and fibula to form the ankle joint. Stedman's Medical Dictionary, 1934 (28th ed., Lippincott Williams & Wilkins 2006).

[2] Debridement is the removal of devitalized tissue and foreign matter from a wound. Stedman's Medical Dictionary, 496.

impingement, and tarsal tunnel syndrome.[3] (Tr. 281-82.) Dr. Shurnas then opined that Sharp was capable of "sit down" work. (Id.)

Over the next several months, Sharp's pain persisted. On March 22, 2005, Dr. Shurnas diagnosed osteonecrosis, and, on April 22, 2005, he removed some of the hardware from Sharp's ankle.[4] (Tr. 273, 320.) After several months of "good steady progress," Dr. Shurnas recommended vocational rehabilitation. (Tr. 267-68.) Despite Sharp's continued complaints of pain, Dr. Shurnas opined that Sharp had reached maximum medical improvement (MMI), and he could return to "light duty" work. (Tr. 260-61.)

On September 26, 2005, Laura L. Brenner, Ph.D., examined Sharp for a consultative mental status evaluation. (Tr. 246.) Dr. Brenner determined that Sharp was mildly depressed due to the problems associated with his ankle injury. (Tr. 249.) Dr. Brenner also noted that Sharp was able to focus in a quiet environment, had basic reading and math skills, had intact interpersonal skills and memory, and had no grooming or hygiene problems. (Tr. 248-49.) Sharp's intellect was assessed to be low average, and Dr. Brenner determined that Sharp was functioning at a Global Assessment of Functioning (GAF) score of seventy.[5] (Id.) There is no evidence of any ongoing pursuit of counseling relative to Sharp's claim of anxiety.

---

[3] Tarsal tunnel syndrome involves pressure on nerves to the foot causing pain. WebMD, http://www.webmd. com/a-to-z-guides/ tarsal-tunnel-syndrome (last visited December 23, 2010).

[4] Osteonecrosis is the death of bone in mass. Stedman's Medical Dictionary, 1391.

[5] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
On the GAF scale, a score from sixty-one to seventy represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy), but the individual generally functions well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

On September 29, 2005, Dr. Jennifer Clark examined Sharp's functional capacity. Sharp claimed that the pain in his left foot was an eight out of ten. Sharp claimed to have difficulty running, lifting twenty-five pounds, vacuuming, grocery shopping, bending, kneeling, squatting, climbing stairs, walking on uneven ground, and doing overhead work. However, Sharp told Dr. Clark that he could stand for around thirty minutes, lift ten pounds with ease, dress, groom, drive, and get up from chairs unassisted. She also noted that he enjoyed playing the guitar, singing, writing music, and had aspirations of a new career in music "since it [did] not look like his foot [was] going to let him do a lot of heavy manual labor." (Tr. 251-54.)

Dr. Clark's physical exam revealed "an overweight white male in no acute distress." Her functional capacity evaluation showed that Sharp could occasionally handle fifty pounds from floor to waist and waist to shoulder, and he could lift thirty pounds shoulder to overhead. However, Dr. Clark noted that Sharp should not carry anything or climb stairs, slopes, or ladders. She also restricted Sharp's standing and walking to an occasional twenty to thirty minutes at a time "for no more than a couple of hours a day." Finally, she noted that his sitting was unrestricted. (Tr. 253-55.)

On May 22, 2006, Paul Stuve, Ph.D., completed a Psychiatric Review Technique Form. He reported that Sharp had "Generalized Anxiety Disorder," and he was "anxious." He noted that Sharp was taking Xanax, and it was helping him sleep.[6] Dr. Stuve concluded that Sharp had only a "mild" degree of limitation, and his mental impairments were "not severe." Dr. Stuve also noted that Sharp was "clearly . . . frustrated by his physical limitations," but Sharp was not depressed. (Tr. 447-59.)

On May 25, 2006, Sheila Oligschlaeger completed a physical residual functional capacity (RFC) assessment of Sharp. In the assessment, Ms. Oligschlaeger found Sharp had the capacity to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk for "at least 2 hours" per workday, and sit for about six hours per workday.

---

[6] Sharp's family doctor, William Bradley, M.D., prescribed him Xanax. (Tr. 224.) Xanax is used to treat anxiety and panic disorders. WebMD, http://www.webmd.com/drugs (last visited August 5, 2010).

She noted no limitations in his ability to push or pull. Ms. Oligschlaeger concluded that these exertional limitations could "reasonably be expected" as a result of Sharp's ankle injury. She also concluded that Sharp "should avoid climbing" ramps, stairs, ladders, ropes, and scaffolds because it could exacerbate his injury. She noted no manipulative, visual, or communicative limitations, but Sharp had several environmental limitations. Ms. Oligschlaeger recommended Sharp avoid "extreme cold, vibration, and hazards" because they could also exacerbate his injury. However, she observed that Sharp's symptoms appeared "to be out of proportion to the medical and laboratory findings." As a result, she concluded Sharp's allegations of pain were only "partially credible." (Tr. 460-65.)

On June 13, 2006, Gary Schmidt, M.D., of Barnes-Jewish West County Hospital in St. Louis, began seeing Sharp for persistent ankle swelling and pain. (Tr. 477-78.) Dr. Schmidt is an orthopaedic specialist. (Tr. 39.) Dr. Schmidt noted that Sharp had not reached MMI, but he could still perform "strictly sedentary" work. (Tr. 479.) A month later, Jason Calhoun, M.D., affirmed that Sharp could perform a "siting job." (Tr. 475.)

After viewing a CT scan of Sharp's ankle that revealed an infection, Dr. Schmidt recommended and Sharp acquiesced to a revision tibial talar arthrodesis.[7] (Tr. 499-501.) Sharp developed a post-operative infection and underwent hardware removal and debridement. (Tr. 482.) By November 2006, Dr. Schmidt noted Sharp was "healing in good alignment," but he recommended Sharp remain off work until he had healed completely. (Tr. 519.) Dr. Schmidt also instructed Sharp to wear a CAM boot and begin "partial to full weight-bearing" exercises. (Tr. 519-20.)

On January 29, 2007, Sharp had an aneurysm in his left ankle surgically repaired. (Tr. 507.) Dr. Schmidt again recommended Sharp remain off work. (Tr. 522.) On March 8, 2007, Dr. Schmidt instructed Sharp to change from his CAM boot to an ankle-foot orthosis (AFO)and to begin full weight-bearing exercises. (Tr. 523.) On March 27, 2007, Dr.

---

[7] Arthrodesis is the stiffening of a joint by operative means. Stedman's Medical Dictionary, 160.

Schmidt reasserted his instruction that Sharp remain off work, but he noted that Sharp was "healing well." (Tr. 524.) On July 27, 2007, Dr. Schmidt noted Sharp had no more swelling, there were no signs of infection, his alignment was "excellent," and his pain had decreased. (Tr. 526.)

On August 23, 2007, Dr. Schmidt wrote that Sharp "may have to live with" pain in his heel, and that he had reached MMI. (Tr. 529.) Dr. Schmidt also noted that Sharp could return to work with permanent limitations: "no stairs, no ladders, no pushing, no pulling, no standing for greater than 1 hour[] without 15 minutes off his feet." (Id.)

On July, 11, 2007, Arshad Muzaffar, M.D., performed a Guyon's canal release and a carpal tunnel release. (Tr. 538-40.) Dr. Muzaffar performed the surgery to alleviate numbness Sharp had been experiencing in the fourth and fifth fingers of his right hand for the past three to four months. (Tr. 534.) During subsequent visits, Dr. Muzaffar noted that Sharp's hand was "feeling better," had full range of motion, improving sensation, and improved function. (Tr. 543, 546-47.) On August 27, 2007, however, Sharp complained of significant pain in his right hand, but Dr. Muzaffar noted that this was due to Sharp's decision to go fishing despite medical advice to the contrary. (Tr. 548.) Dr. Muzaffar scheduled a return visit for two weeks later, but nothing in the record suggests Sharp returned. (Tr. 549.)

There is also no evidence of any ongoing pursuit of care relative to Sharp's claims of disability due to his knee problems, the "plate in [his] skull," or the ringing in his ears.

**Testimony at the Hearing**

On October 11, 2007, Sharp testified before the ALJ. He testified that he was forty-seven years old; had a twelfth-grade education; and last worked patching, repairing, and painting walls in July 2004. (Tr. 29-33.)

After falling from a ladder and injuring his ankle, Sharp underwent emergency surgery at the University of Missouri Hospital. This was followed by approximately ten more surgeries over the next several years and several infections which relegated him to near-constant foot

elevation. His wife dedicated significant time to caring for him during this period. At the time of the hearing, the swelling in Sharp's lower leg was subsiding, the pain persisted, and his left foot had turned black. To alleviate swelling and pain since the accident, Sharp testified that he would frequently spend "three fourths of the day" with his left leg elevated. He testified that the pain made it difficult for him to perform activities such as showering, taking the trash to the end of the driveway, and operating a manual transmission vehicle. (Tr. 36-46.)

When asked if he could perform the duties of a receptionist or any other job that required regular attendance and eight-hour days, Sharp testified that he could not perform such work since the time of the accident. He explained that, without regular elevation, the pain in his foot would make work of that nature unbearable. Sharp estimated that he could only walk 100 feet before experiencing significant pain, and he could not walk around a city block unassisted. (Tr. 43-44, 55-56.)

Since the time of the accident, Sharp testified that he had traveled to Alton, Illinois, to visit relatives and listen to his relative's band perform. He also testified that he had attempted to go hunting on his property using a four-wheeler. (Tr. 43.)

### III. DECISION OF THE ALJ

The ALJ noted that Sharp alleged disability based on the fracture of his left ankle, carpel tunnel syndrome, knee problems, presence of a plate in his skull, ringing in his ears, and emotional or mental impairment. The ALJ found that Sharp suffered from severe impairments due to his left ankle fracture, subtalar fracture dislocation, and postoperative complications. The ALJ also found that, during the period of July 29, 2004, through August 23, 2007, Sharp's numerous surgeries, medical appointments, and symptoms resulted in absenteeism that was

inconsistent with competitive employment. For this reason, the ALJ determined that Sharp was disabled during this period.[8] (Tr. 18-22.)

The ALJ found that Sharp's carpel tunnel syndrome was not a severe impairment because the record did not reveal that Sharp continued to pursue care during the relevant period, and Sharp had not established that his carpel tunnel had or would significantly limit his ability to perform basic work-related activities for twelve consecutive months. The ALJ also found that Sharp's lack of continued pursuit of care regarding his knee problems, the plate in his skull, and the ringing in his ears precluded any claim of disability due to these ailments. Sharp's failure to pursue further psychological counseling, the lack of clinically significant findings of Sharp's consultative examination, and Dr. Brennan's opinion that Sharp was experiencing only mild limitations also resulted in the preclusion of emotional or mental impairment. (Tr. 19-21.)

The ALJ found that, beginning August 24, 2007, Sharp was not disabled because he had the RFC to perform the full range of sedentary work though he did not retain the ability to perform past relevant work.[9] The ALJ conceded that Sharp's impairments could reasonably be expected to produce the pain he alleged. However, the ALJ deemed Sharp's statements regarding his disabling pain to be "not entirely credible." The ALJ based this on Dr. Schmidt's determination that Sharp had reached MMI and that he could return to work, the failure of the record to reveal ongoing pursuit of care, the unremarkable findings of the most recent clinical examinations, and Sharp's history of limited work and earnings. The ALJ also noted that Sharp's medical improvements gave him the ability to perform basic work activities, he was between the ages of forty-five

---

[8] Despite the conclusion that Sharp was disabled due to his surgeries, appointments, and symptoms, the ALJ was careful to note that Sharp retained the RFC to lift or carry ten pounds occasionally or frequently, sit for about six hours per workday, and stand or walk for about two hours per workday throughout the period of his disability. (Tr. 21-22.)

[9] He had the capacity to frequently lift or carry up to ten pounds, stand or walk about two out of eight hours, and sit about six out of eight hours. (Tr. 24.)

and forty-nine at the time, he had completed twelve years of schooling, and the transferability of his job skills was immaterial. (Tr. 22-25.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating

he is no longer able to return to his past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

In this case, the Commissioner determined that Sharp could not perform his past work, but that he had the RFC to perform other work in the national economy.

## V. DISCUSSION

Sharp argues the ALJ's decision is not supported by substantial evidence.  First, Sharp argues that the ALJ failed to properly consider his RFC.  Second, Sharp argues that the ALJ improperly relied on the Medical-Vocational Guidelines (Guidelines) in finding him not disabled. (Doc. 17.)

### A. Residual Functional Capacity

The ALJ found that Sharp was capable of frequently lifting up to ten pounds, standing or walking for up to two hours, sitting for up to six hours, and performing the full range of sedentary work. (Tr. 23-24.)  In that regard, the ALJ evidently relied on Dr. Schmidt's opinions which indicated that Sharp had reached MMI, and Sharp could return to work. (Tr. 25, 524-29.)  However, on August 23, 2007, Dr. Schmidt recommended additional, permanent limitations: "no stairs, no ladders, no pushing, no pulling, no standing for greater than 1 hour[] without 15 minutes off his feet."  (Tr. 529.)

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  But before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Id. at 1218.  Ultimately, the RFC is a medical question, which must be supported by medical

evidence contained in the record.  Casey, 503 F.3d at 697; Laurel v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ first found that Sharp's allegations of persistent pain were not entirely credible. This determination is reserved primarily for the ALJ. Pearsall, 274 F.3d at 1218. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). Though Sharp disputes the ALJ's RFC determination, he does not dispute the ALJ's determination of his credibility. (Doc. 17 at 15-18.) The undersigned will defer to the ALJ's determination.

There is substantial evidence to support the ALJ's finding that Sharp's claim of disabling pain is not credible.  Sharp's work and earnings history does not suggest that, but for his alleged pain, he would be working and engaging in substantial gainful activity.  From 1977 to 2004, Sharp averaged only around $3,500 annual income, including two years with no income whatsoever. (Tr. 111.)  In addition, Dr. Schmidt noted that Sharp reached MMI and could return to work. (Tr. 529.)  He also observed in previous treatment notes that Sharp was capable of a "strictly sedentary job" before his most recent and successful surgery. (Tr. 479.)  Dr. Calhoun concurred that Sharp was capable of "sit down" work at the time. (Tr. 475.)  Sharp's prior treating physician, Dr. Shurnas, said Sharp was capable of "sit down" and "light work."  (Tr. 261, 267-68, 281-82.)  Dr. Clark concluded that Sharp could return to work as well. (Tr. 255.)  Sheila Oligschlaeger mirrored the ALJ's conclusion that Sharp's claims were only "partially credible," and his "symptoms are out of proportion to the medical and laboratory findings." (Tr. 465.)  Sharp's self-professed activities, such as hunting, fishing, and recreational traveling, (Tr. 43, 548), also belie his claims of pain of the degree sufficient to be considered disabling.  Finally, there is no evidence of ongoing pursuit of care from accepted sources, and an ALJ may properly discount a claimant's credibility based on a failure to pursue regular medical treatment. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

Though the ALJ's credibility determination is supported by substantial evidence, the court concludes that his RFC assessment was not based on a complete analysis. It is not clear from the ALJ's opinion whether the ALJ actually considered the opinions of Dr. Schmidt, Dr. Clark, and Ms. Oligschlaeger in their entirety, what weight the ALJ placed on those opinions, and how those opinions affect Sharp's RFC after August 23, 2007. This represents incomplete analysis and requires remand. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (alteration in original) (citation omitted).

Under the regulations, treating physicians' opinions, especially those of Dr. Schmidt because they were rendered so closely to the date the ALJ found Sharp not disabled, are entitled to controlling weight, provided that they are well-supported: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(d)(2) (2006). The regulations further state that, "[u]nless we give a treating source's opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion. (1) Examining relationship . . . . (2) Treatment relationship . . . . (3) Supportability . . . . (4) Consistency . . . . (5) Specialization . . . . (6) Other factors . . . . 20 C.F.R. 404.1527(d) (2006).

As indicated, Dr. Schmidt is Sharp's long-term treating physician and an orthopaedic specialist. During this time, Dr. Schmidt examined Sharp's ankle and laboratory results many times and performed multiple surgeries on Sharp's ankle. However, the ALJ failed to discuss or even mention the list of permanent limitations Dr. Schmidt provided.

The Commissioner argues that it was permissible for the ALJ to give Dr. Schmidt's opinion regarding Sharp's permanent limitations less weight

because "it contains no explanation for the limitations described." (Doc. 19 at 12.) However, this explanation is not suggested by the ALJ in his decision. In fact, the ALJ does not explain why he has ignored Dr. Schmidt's noted limitations or the amount of weight he accorded Dr. Schmidt's opinion. (Tr. 25.); See 20 C.F.R. § 404.1527(d)(2) (2006) (even if a treating source is not given controlling wait, the ALJ should "always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] your treating source's opinion"). The ALJ's conclusion, which is inconsistent with Sharp's treating physician's assessment, is unexplained. In a similar case, reversal was ordered. Brown v. Comm'r of Soc. Sec. Admin., 245 F.Supp.2d 1175, 1186-87 (D. Kan. 2003) (reversed when ALJ never explained why he made findings inconsistent with medical assessment nor did he acknowledge that he was rejecting portions of the assessment).

Of special relevance is Dr. Schmidt's restriction that Sharp do no pushing or pulling. (Tr. 529.) SSR 96-9P instructs that, while "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base," 1996 WL 374185 at 6, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity." id. at *8. It is not for the court, but for the ALJ, to decide whether Sharp's impaired condition, which prevents him from performing his past relevant work (Tr. 22), affects his ability to push or pull, as Dr. Schmidt has restricted him, and whether this adversely affects his RFC.

Consequently, the decision must be reversed and remanded. Upon remand, the ALJ must consider, evaluate, and express his consideration of Dr. Schmidt's opinions.

**B. ALJ's Reliance on Guidelines**

In making his determination, the ALJ relied on the Guidelines to find Sharp was not disabled. (Tr. 25.) Sharp argues that this reliance was improper, and Dr. Schmidt's listed limitations should have precluded such reliance and mandated testimony from a vocation expert (VE). (Doc. 17 at 17-18.)

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c) (2003). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Guidelines. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a nonexertional impairment, the Commissioner may still meet this burden by consulting the Guidelines but only in certain circumstances. See Delph v. Astrue, 538 F.3d 940, 948 (8th Cir. 2008) (citing Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992)). "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997).

Thus, even if the ALJ incorporates the additional exertional and nonexertional limitations, it does not necessarily follow that he must consult a VE, and it remains proper for him to use the Guidelines. In other words, provided that the ALJ determines that Sharp's abilities fall somewhere within the relevant spectrum of sedentary work, the choice to consult a VE remains at the discretion of the ALJ. See SSR 96-P9, 1996 WL 374185, at * 6 (Soc. Sec. Admin. July 2, 1996).

What remains is for the ALJ to determine whether Dr. Schmidt's limitation of no pushing or pulling would take Sharp outside the relevant spectrum of sedentary work.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. An appropriate Judgment Order is issued herewith.

　　　　　　　　　　　　　　　　/S/   David D. Noce　　　　　
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on December 29, 2010.